BARNICKEL, Appellant,

v.

AUTO OWNERS INSURANCE COMPANY et al., Appellees.

[Cite as *Barnickel v. Auto Owners Ins. Co.*, 186 Ohio App.3d 722, 2010-Ohio-1100.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2009–09–223.

Decided March 22, 2010.

Henry D. Acciani, for appellant.

Erin B. Moore, for appellee Auto Owners Insurance Company.

Jennifer Kirkpatrick Nordstrom, for appellee Westfield Insurance Company.

RINGLAND, Judge.

{¶ 1} Plaintiff-appellant, Derek Barnickel, appeals a decision of the Butler County Court of Common Pleas entering summary judgment in an insurance dispute in favor of defendant-appellees, Auto Owners Insurance Company ("Auto–Owners") and Westfield Insurance Company ("Westfield").

{¶ 2} According to appellant, in early March 2006, Donald Nusbaum approached him to repair a 2002 Independence Freedom motorcycle. Nusbaum, a friend of appellant, is the owner and operator of the motor-vehicle dealership Automan's Auto Sales. Appellant had a background in repairing motor vehicles, having owned and operated several auto-related businesses over the years. At the time, appellant was operating Ace Motor Sports, an auto-body shop located on Princeton–Glendale Road. Appellant agreed to repair the motorcycle and drove it to his home, which was only a couple of miles away. Appellant had a motorcycle lift and tools to repair the mechanical and body components of the vehicle. Appellant also stated that he was considering purchasing the motorcycle from Nusbaum once it was repaired.

{¶ 3} A couple of days later, Nusbaum contacted appellant requesting that he provide a check in the amount of $12,000 to hold in case Nusbaum was audited and had to show some evidence that the bike had not been sold without paying on his floor plan. Appellant wrote a check from his credit-card account, which had a $7,000 credit limit, since he did not believe the check would be cashed by Nusbaum or honored by his credit-card company. Appellant claims that he wrote "2002 Harley" on the memo line as further evidence that the check would not be considered payment for an Independence motorcycle. However, Nusbaum cashed the check the same day it was received. To support his position, appellant asserts that Nusbaum has a history of taking money in other improper

vehicle transactions, including having a judgment against him for approximately $69,000.

{¶ 4} Over the next several weeks, appellant worked on repairing the motorcycle. Believing that the mechanical problem had been resolved, appellant took the vehicle for a test drive on April 18, 2006. Appellant was involved in a horrific accident and sustained severe personal injuries, including the loss of his leg above the knee. While appellant was in the hospital in a drug-induced coma, Nusbaum forged appellant's signature on the title application, filed the title, and had the vehicle transferred to appellant. Eight to nine months later, appellant received a settlement from the tortfeasor's insurance company for the policy limits, which included a property-damage settlement in the amount of $17,500.

{¶ 5} Appellant filed suit against Automan's insurance carrier, Auto–Owners, and his personal insurance carrier, Westfield, for underinsured-motorist coverage. The insurance companies denied appellant's claim, asserting that appellant had purchased the motorcycle from Nusbaum. The insurance companies relied upon the deposition testimony of Nusbaum, who claimed that no repairs were necessary on the vehicle, it was in perfect working condition, and appellant had purchased it outright. Moreover, the companies further claimed that appellant's version of the events was implausible because appellant performed only paint and body work and was not engaged in the business of mechanically repairing motorcycles. Further, the companies submit that appellant kept the vehicle at his residence with his other motorcycles, wrote a check for the motorcycle, the check was never disputed by appellant, appellant used his license plates from his dealership on the vehicle, the bike was available solely for appellant's personal use, and appellant and Nusbaum had engaged in a similar transaction for a Mercedes automobile.

{¶ 6} Following motions from Auto–Owners and Westfield, the trial court entered summary judgment in favor of both companies, finding that appellant was the owner of the motorcycle. Appellant timely appeals, raising a single assignment of error:

{¶ 7} "The trial court erred in granting summary judgment in favor of Auto–Owners Insurance and Westfield Insurance Company."

{¶ 8} In his sole assignment of error, appellant argues that the trial court erred in granting summary judgment in favor of the insurance companies.

{¶ 9} Summary judgment is a procedural device used to terminate litigation and avoid a formal trial when there are no issues in a case to try. *Forste v. Oakview Constr., Inc.*, Warren App. No. CA2009–05–054, 2009-Ohio-5516, 2009 WL 3350450, ¶ 7. An appellate court's review of a summary-judgment decision is de novo. *Creech v. Brock & Assoc. Constr.*, 183 Ohio App.3d 711, 2009-Ohio-3930,

918 N.E.2d 541, ¶ 9, citing *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. In applying the de novo standard, a reviewing court is required to " 'us[e] the same standard that the trial court should have used, and * * * examine the evidence to determine whether as a matter of law no genuine issues exist for trial.' " *Bravard v. Curran,* 155 Ohio App.3d 713, 2004-Ohio-181, 803 N.E.2d 846, ¶ 9, quoting *Brewer v. Cleveland Bd. of Edn.* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023. In turn, an appellate court must review a trial court's decision to grant or deny summary judgment independently, without any deference to the trial court's judgment. *Bravard,* citing *Burgess v. Tackas* (1998), 125 Ohio App.3d 294, 295, 708 N.E.2d 285.

{¶ 10} A trial court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264. The nonmoving party must then present evidence to show that there is some issue of material fact yet remaining for the trial court to resolve. Id. at 293, 662 N.E.2d 264. A material fact is one that would affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. In deciding whether a genuine issue of material fact exists, the evidence must be construed in the nonmoving party's favor. *Walters v. Middletown Properties Co.,* Butler App. No. CA2001–10–249, 2002-Ohio-3730, 2002 WL 1625682, ¶ 10.

## OWNERSHIP

{¶ 11} The first question in this case is whether appellant was the owner of the motorcycle. If appellant was the owner, neither insurance company would be responsible for underinsured-motorists coverage since the motorcycle would not be insured under Automan's policy provided by Auto–Owners and appellant did not add the vehicle to his personal insurance policy provided by Westfield.

{¶ 12} Appellant claims that although he was considering purchasing the vehicle once it was repaired, he was not the owner, and he accepted possession of the motorcycle "solely for the purpose to conduct mechanical repairs on it." In contrast, both insurance companies claim that the evidence indicates that appellant had purchased the vehicle and was the owner. The companies submit *Smith v. Nationwide Mut. Ins. Co.* (1988), 37 Ohio St.3d 150, 524 N.E.2d 507, as justification for denying coverage.

{¶ 13} In *Smith,* Roger Smith purchased a vehicle from Charles Pierce. Id. at 151, 524 N.E.2d 507. Smith was given the title after the sale, but the titleholder's signature had not been notarized and Smith never obtained insurance for the vehicle. Id. Additionally, Pierce did not cancel his insurance policy on the vehicle provided by Nationwide. Id. While driving the vehicle, Smith was struck and severely injured in an auto accident. Id. The tortfeasor's insurance company paid its policy limits to Smith. Id. Smith then filed a claim with Nationwide seeking underinsured-motorists coverage. Id. Nationwide denied coverage, claiming the policy no longer applied to the vehicle following the sale. Id.

{¶ 14} The Supreme Court analyzed whether the Uniform Commercial Code ("UCC") or the Certificate of Title Act determines insurance coverage. The UCC provision provided that "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place * * *." *Smith,* 37 Ohio St.3d at 152, 524 N.E.2d 507, citing R.C. 1302.42(B). The Certificate of Title Act states, "No person acquiring a motor vehicle from the owner thereof * * * shall acquire any right, title, claim, or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle * * *." Id., citing R.C. 4505.04. The Ohio Supreme Court concluded that for the purposes of insurance coverage, the Uniform Commercial Code provision applied and Nationwide was not required to provide coverage. Id. at syllabus.

{¶ 15} In this case, the trial court held, "Plaintiff was delivered the motorcycle on or around March 6, 2006. Payment was accepted by Automans and the check was cashed on March 8, 2006. Under the law in Ohio, ownership would lie with Plaintiff even though the title had not yet been transferred. Plaintiff's denial of ownership does not, in itself, create a genuine issue of material fact. * * * In viewing the actions of the parties, it is clear that property was turned over by Automans to Plaintiff and Plaintiff paid for that property. Plaintiff did not dispute at any point in the timeline the sale of his motorcycle or the transfer of title to him. On the contrary, Plaintiff received a settlement for property damage. This is a strong indicator that Plaintiff acknowledged ownership of the motorcycle."

{¶ 16} However, we find clear distinctions between this matter and the facts of *Smith* that create a genuine issue of material fact regarding ownership. In *Smith,* there was no dispute that the vehicle had been sold and that Smith was the owner. In this case, a genuine issue of fact exists regarding whether the motorcycle was sold.

{¶ 17} This case involves two completely different versions of the events. Nusbaum claimed that the motorcycle was in perfect condition with only 3,000 miles when appellant purchased the vehicle from him. He claimed that there were no mechanical or cosmetic problems. According to Nusbaum, the title was not filed at appellant's request because appellant did not want to pay taxes at the time of the purchase. The insurance companies argue that appellant "accepted, affirmed or ratified the existence of any contract or waived any objection to its existence by failing to reject, rescind or dispute any element of the contract and by keeping all benefits of that sale agreement."

{¶ 18} In contrast, appellant urges that he was hired to repair the motorcycle and kept the vehicle at his residence during that time. The record in this case includes facts that support appellant's position, creating a genuine issue of fact regarding ownership. First, no written purchase agreement was executed between appellant and Nusbaum. After taking possession of the vehicle, appellant did not register the vehicle with his insurer, Westfield, for coverage under his personal policy. Appellant admitted that he was interested in purchasing the motorcycle from Nusbaum, but only after repairs had been completed.

{¶ 19} Moreover, the title was forged. Nusbaum did not have a power of attorney from appellant authorizing this action. Following appellant's accident, Nusbaum forged appellant's name on the title and filed it. In his deposition, Nusbaum sought to rationalize this conduct, explaining that they were friends and that appellant's uncle, Barry, requested that he transfer the title to the motorcycle. Yet there is no evidence that Barry could authorize this transaction. Further, while the UCC typically controls over the Certificate of Title Act, as described by the Ohio Supreme Court in *Smith,* the Certificate of Title Act serves to protect bona fide purchasers against fraudulent transfers. Here, an issue exists whether Nusbaum forged the title without appellant's knowledge or consent and in violation of the criminal law, improperly converting the $12,000 check contrary to their oral agreement.

{¶ 20} We recognize that evidence also exists in this matter that weighs in favor of the insurance companies and a jury may not ultimately accept appellant's version of the events. However, in considering the motion for summary judgment, the evidence must be construed in favor of appellant. The trial court in this case failed to view the evidence in favor of appellant and ignored the facts that supported his position. Instead, the court improperly weighed the evidence, accepting Nusbaum's version of the events as true and concluding that appellant's acts were a "strong indicator" of ownership. Based upon the foregoing, we find that genuine issues of material fact exist regarding ownership of the motorcycle and whether a sale occurred in this matter.

## AUTO–OWNERS' COVERAGE

{¶ 21} Auto–Owners next contends that appellant was merely a garage customer. The Auto–Owners policy purchased by Automan's provides underinsured-motorist coverage up to $1,000,000. Specifically, the Auto–Owners policy states that an "insured" includes "any person while using an automobile covered by this coverage form * * * provide the actual use of the automobile is with the permission of the named insured." However, the policy excludes garage customers as insureds, only providing garage customers up to $12,500 in coverage. Under the policy, "Garage Customer" includes a vehicle "furnished or loaned to a customer of the garage or a prospective purchaser." Auto–Owners asserts that even if appellant was not the owner of the motorcycle, he was a prospective purchaser since he expressed interest in purchasing the vehicle and, as a result, he is precluded from recovering under the policy since he has recovered more than the garage-customer policy limits from the tortfeasor's insurance company.

{¶ 22} We are unconvinced by Auto–Owners' argument. Appellant claims that he was repairing the vehicle at the request of Nusbaum. Appellant acknowledges that he expressed interest in purchasing the vehicle and discussed a potential purchase with Nusbaum; however, appellant urges that he would not consider purchasing the vehicle until the repairs were complete. The issue remains whether appellant's possession of the vehicle was related to the completion of repairs for Automan's or if his interest in purchasing the motorcycle made him a garage customer. Accordingly, we cannot say, as a matter of law, that appellant is excluded from the Auto–Owners underinsured-motorist coverage for being a garage customer.

## WESTFIELD'S COVERAGE

{¶ 23} Westfield asserts that it is not responsible for providing coverage because the "regular use" exception in the policy excludes any underinsured motorist coverage. The contractual provision provides, "We do not provide * * * Underinsured Motorists Coverage for *bodily injury* sustained by an *insured* while operating * * * any motor vehicle owned by or furnished or available for the regular use of you * * * which is not insured for this coverage under this policy." This provision is consistent with the language of R.C. 3937.18(I)(1). As explained above, a genuine issue of material fact exists regarding whether appellant was the owner of the motorcycle. Westfield argues though that even if appellant possessed the motorcycle as a mechanic, the vehicle was furnished or available for appellant's regular use, and appellant is therefore excluded from the underinsured coverage.

{¶ 24} The words "regular use" in an automobile liability insurance policy are unambiguous and are to be given their ordinary meaning. *Beverly v. Midwestern Indemn. Co.* (1989), 60 Ohio App.3d 139, 141, 573 N.E.2d 1221. "Regular use" refers to use that is "frequent, steady, constant or systematic." *Ohio Cas. Ins. Co. v. Travelers Indemn. Co.* (1975), 42 Ohio St.2d 94, 100, 71 O.O.2d 69, 326 N.E.2d 263; *Sanderson v. Ohio Edison Co.* (1994), 69 Ohio St.3d 582, 589, 635 N.E.2d 19. Determination of regular use is a fact-specific inquiry to be determined on a case-by-case basis. *Ohio Cas. Ins. Co. v. Travelers* at 101, 326 N.E.2d 263. See also *Auto–Owners Ins. Co. v. Merillat,* 167 Ohio App.3d 148, 2006-Ohio-2491, 854 N.E.2d 513, ¶ 43.

{¶ 25} On several occasions, the Ohio Supreme Court has examined regular-use exclusions in automobile insurance policies. In *Kenney v. Emps.' Liab. Assur. Corp.* (1966), 5 Ohio St.2d 131, 34 O.O.2d 259, 214 N.E.2d 219, a police officer was injured in an auto accident while occupying his police cruiser. Id. at 132, 34 O.O.2d 259, 214 N.E.2d 219. The officer sought recovery for medical payments from his family automobile policy. Id. The policy contained a regular-use exclusion similar to the case at bar. Id. The Supreme Court concluded that the officer could not recover from his personal insurer because "[i]n our opinion, where a city police officer working on general police duty is assigned to work in a police motor vehicle on 122 of 164 working days, such a vehicle is as a matter of law 'an automobile furnished for' his 'regular use' within the meaning of such policy provisions." Id. at 135, 34 O.O.2d 259, 214 N.E.2d 219.

{¶ 26} In *Ohio Cas. Ins. Co. v. Travelers,* Ben and Emma Andrews were injured in an accident with Thomas Berry. 42 Ohio St.2d at 94, 71 O.O.2d 69, 326 N.E.2d 263. Berry was driving a "loaner" provided by an automobile dealership. Id. The Andrewses filed an action for bodily injuries against Berry and the dealership. Id. at 95, 71 O.O.2d 69, 326 N.E.2d 263. Berry's personal insurer, Ohio Casualty, sought a declaratory-judgment action. Id. at 96, 71 O.O.2d 69, 326 N.E.2d 263. Ohio Casualty argued that coverage should be provided under the dealership's garage policy, which provided coverage for vehicles furnished by the dealership to any person for regular use and, as a result, it had no duty to defend Berry because the loaner was furnished for his regular use. Id. The court concluded that the loaner had been furnished for Berry's regular use during the loan period and, as a result, Ohio Casualty was not responsible for providing coverage. Id.

{¶ 27} In *Thompson v. Preferred Risk Mut. Ins. Co.* (1987), 32 Ohio St.3d 340, 513 N.E.2d 733, the appellant was injured by an uninsured motorist. The automobile was owned by Thompson's girlfriend, Robin Fairchild, who lived with Thompson and his brother. Id. at 340, 513 N.E.2d 733. Thompson's brother possessed an insurance contract with Preferred Risk Insurance, which included

an uninsured-motorist provision that extended coverage to any relative of the insured, subject to certain exclusions. Id. Thompson filed a claim with Preferred Risk seeking coverage for injuries and lost wages. Id. The policy contained a regular-use exclusion. Id. at 342, 513 N.E.2d 733.

{¶ 28} The court held that the insurance company was required to provide coverage because the vehicle was not provided for Thompson's regular use and, as a result, the exclusion was inapplicable. Id. at 343, 513 N.E.2d 733. The court reasoned, "[A]lthough Gregory Thompson, on various occasions, used the automobile, Fairchild retained the only set of keys to the vehicle. Moreover, Gregory Thompson was not free to use the vehicle at any time he pleased but was required to secure the permission of and obtain the keys from Fairchild every time the vehicle was used." Id. at 342–343, 513 N.E.2d 733.

{¶ 29} Finally, in *Sanderson v. Ohio Edison*, Sanderson was injured when she was hit by a truck driven by a ten-year-old child. 69 Ohio St.3d at 583, 635 N.E.2d 19. The truck had been provided to the child's father, Thomas Allen, by his employer Ohio Edison. Id. Sanderson filed suit against the parents. Id. The Allens admitted liability and allowed the court to determine the amount of damages. Id. The court awarded damages in the amount of $79,000. Id. Sanderson filed suit against Ohio Edison and its insurance provider, Ohio Farmers Insurance, for satisfaction of the judgment. Id. The insurance company argued that no coverage existed because the vehicle was furnished for Allen's regular use. Id. at 589, 635 N.E.2d 19. Although the company claimed that Allen used the truck as a personal vehicle on many occasions, evidence suggested that he had only used the truck for personal purposes on one prior occasion. Id.

{¶ 30} Distinguishing the case from *Kenney*, the court found, "Thomas Allen took the Ohio Edison truck home only when he was acting as temporary foreman. A temporary foreman was designated by Ohio Edison only when the regular foreman was unable to work. Thomas Allen testified that he had possession of the Ohio Edison truck only eight to ten times over the course of one year. We do not believe that this occasional possession of the Ohio Edison truck constitutes frequent, steady, constant or systematic use. We hold that an automobile is not furnished for the regular use of an insured where the insured has only occasional possession of the automobile, which does not exceed ten occasions in one year." *Sanderson*, 69 Ohio St.3d at 589–590, 635 N.E.2d 19.

{¶ 31} In this case, Westfield asks us to review the signposts established by the Sixth District Court of Appeals that are indicative of whether a vehicle has been furnished for regular use. In *Hartman v. Progressive Max Ins. Co.*, Williams App. No. WM–05–007, 2006-Ohio-1629, 2006 WL 832915, the court stated that although none of the factors are unilaterally dispositive, courts should consider "(1) whether the vehicle was available most of the time to the insured; (2)

whether the insured made more than mere occasional use of the vehicle; (3) whether the insured needed to obtain permission to use the vehicle; (4) whether there was an express purpose conditioning use of the vehicle; and (5) whether the vehicle was being used in an area where its use would be expected." Id. at ¶ 13. Westfield believes that these factors support a finding of regular use.

{¶ 32} The instant matter is similar to the Sixth District's decision in *Roeser v. State Farm Ins. Cos.*, 183 Ohio App.3d 168, 2009-Ohio-3395, 916 N.E.2d 533. Roeser worked as an auto mechanic. Id. at ¶ 2. After repairing the brakes on a vehicle, Roeser took it for a test drive. Id. Roeser was injured when struck from behind by a negligent driver. Id. at ¶ 3. After settling a personal-injury claim with the driver, Roeser filed a claim for underinsured coverage with his own insurer, State Farm. Id. at ¶ 4. State Farm denied coverage, claiming that Roeser was operating a vehicle for his regular use. Id. at ¶ 5.

{¶ 33} Relying upon the *Hartman* factors, the Sixth District concluded, "[W]e find it abundantly clear that appellant had not been provided the vehicle in which he was injured for his 'regular use.'" Id. at ¶ 22. "[A]ppellant's use of this vehicle or any other was, at best, occasional; * * * appellant's use of this vehicle or any other at the dealership required permission; * * * appellant's use of any vehicle owned by the dealership or its customers was only within the circumscribed scope of his duties as a mechanic; and * * * there is nothing in the record to suggest that appellant was on any frolic or detour for his own purposes." Id.

{¶ 34} Similar evidence exists in this case. When construing the facts in a light most favorable to appellant, we conclude that a genuine issue of material fact exists regarding regular use. Although the motorcycle was garaged at his home for a prolonged period of time, assuming that the vehicle was entrusted with appellant for the purpose of repair, "frequent, steady, constant or systematic use" would not be within his scope of possession. As demonstrated by *Thompson* and *Roeser*, if the vehicle was furnished for the purposes of repair, appellant would not be free to use the vehicle as he pleased. Similarly, even if appellant was a customer of Automan's based upon his interest in purchasing the motorcycle, issues exist regarding whether appellant would have been authorized to "frequently, steadily, constantly or systematically" use the vehicle or if permission was necessary.

{¶ 35} Although the motorcycle was exclusively available to appellant since it was in his sole possession, the insurance company fails to submit any evidence that he ever used the motorcycle outside of his capacity as a mechanic or for his personal use. Availability is only one factor. There is no evidence that appellant made more than mere occasional use of the motorcycle. Rather, appellant testified that it was primarily nonfunctional during his period of possession

because he was repairing the vehicle. As a result, a genuine issue of material fact exists regarding whether the motorcycle was furnished or available for appellant's regular use.

{¶ 36} Finally, Westfield asserts that it should be dismissed from this action because its policy limits are less than Auto–Owners' coverage. Specifically, Auto–Owners' underinsured coverage limit is $1,000,000 while Westfield's limit is $300,000. Westfield argues that if appellant is not found to own the motorcycle, the primary coverage supplied by Auto–Owners would exceed any amount for which it would be responsible.

{¶ 37} However, we can foresee a scenario where the trier of fact could conclude that appellant was not the owner of the vehicle but also find that appellant was a garage customer due to his potential interest in purchasing the vehicle from Automan's. Under this hypothetical, the regular-use issue remains since the scope of appellant's use as a garage customer could also be limited. If the trier of fact would find that appellant was a garage customer but the motorcycle was not furnished or available for his regular use, Auto–Owners would only be liable for its garage policy limits, while Westfield would be responsible for the additional coverage. As a result, Westfield cannot be dismissed from the action.

{¶ 38} Appellant's sole assignment of error is sustained.

{¶ 39} The judgment is reversed. This case is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

YOUNG, P.J., and POWELL, J., concur.